IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

—————————————————

NO. 22-2178

—————————————————

**UNITED STATES OF AMERICA**,

*Appellee,*

v.

**JOSHUA DUGGAR,**

*Appellant.*

—————————————————

Appeal from the United States District Court
For the Western District of Arkansas

—————————————————

REPLY BRIEF OF APPELLANT

—————————————————

Justin K. Gelfand
Missouri Bar No. 62265
Margulis Gelfand, LLC
7700 Bonhomme Avenue, Suite 750
St. Louis, MO 63105
(314) 390-0234 (phone)
(314) 485-2264 (fax)
justin@margulisgelfand.com

*Attorney for Appellant*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ............................................................... iii

ARGUMENT ...................................................................................... 1

I. THE DISTRICT COURT VIOLATED DUGGAR'S RIGHT TO PRESENT A COMPLETE DEFENSE ............................................................................ 1

    A. The Standard of Review is *De Novo* ................................................ 2

    B. The Government Attempts to Rewrite History ................................. 4

        1. *Duggar Established a Nexus Between Williams and the Charges* ............ 5

        2. *The District Court Prohibited Meaningful Questioning of Williams* ........ 9

        3. *The District Court Consistently and Repeatedly Misconstrued Holmes* ..................................................................................... 12

    C. This Error Was Not Harmless ...................................................... 12

II. THE DISTRICT COURT ERRED IN DENYING DUGGAR'S MOTION TO SUPPRESS STATEMENTS ............................................................................ 14

    A. Duggar Was in Custody .............................................................. 15

    B. The Seizure of Duggar's Phone Violated His Rights .................... 19

III. THE DISTRICT COURT ERRED IN PERMITTING THE GOVERNMENT'S EXPERT TO TESTIFY CONCERNING EXIF METADATA AND IN PRECLUDING DUGGAR'S EXPERT FROM OPINING ON THE UNRELIABILITY OF THE DATA AND THE METHODOLOGY ............... 21

Appellate Case: 22-2178    Page: 2    Date Filed: 12/27/2022 Entry ID: 5230640

A.  The District Court Abused Its Discretion by Allowing Fottrell to Testify About EXIF Metadata ....................................................................21

B.  The District Court Erred by Excluding Duggar's Expert's Testimony About EXIF Metadata ........................................................................25

CONCLUSION ....................................................................................28

CERTIFICATES OF SERVICE AND COMPLIANCE ...........................................30

Appellate Case: 22-2178     Page: 3     Date Filed: 12/27/2022 Entry ID: 5230640

# TABLE OF AUTHORITIES

**Cases**

*Am. Mod. Home Ins. Co. v. Thomas*, 993 F.3d 1068 (8th Cir. 2021)......................10

*Armstrong v. Hobbs*, 698 F.3d 1063 (8th Cir. 2012)...........................................8, 9

*Boykin v. United States*, 738 A.2d 768 (D.C. 1999) ........................................7

*Crane v. Kentucky*, 476 U.S. 683 (1986) .................................................1

*Cummings v. Malone*, 995 F.2d 817 (8th Cir. 1993) ..............................................11

*Davis v. United States*, 512 U.S. 452 (1994) ...................................... 15, 20

*Escobedo v. State of Ill.*, 378 U.S. 478 (1964).........................................21

*Florida Bar v. MacNamara*, 132 So. 3d 165 (Fla. 2013) .......................................27

*Holmes v. South Carolina*, 547 U.S. 319 (2006) ..................................... 2, 7, 11, 12

*Miranda v. Arizona*, 384 U.S. 436 (1966) ......................................... 17, 18, 19, 20

*Pearson v. U.S. Bank Nat'l Ass'n*, No. 13-889, 2014 WL 4163020 (D. Minn. Aug. 21, 2014) ...........................................................................27

*Thompson v. Keohane*, 516 U.S. 99 (1995) ............................................19

*United States v. Aldridge*, 664 F.3d 705 (8th Cir. 2011) ........................................15

*United States v. Aungie*, 4 F.4th 638 (8th Cir. 2021)..................................................3

*United States v. Banks*, 43 F.4th 912 (8th Cir. 2022) ............................................24

*United States v. Boyajian*, No. 09-cr-933, 2012 WL 4094977 (C.D. Cal. 2012)....27

*United States v. Crawford*, 1:19-CR-170, 2021 WL 2367592 (W.D.N.Y. 2021).......
...................................................................................... 23, 24

Appellate Case: 22-2178     Page: 4     Date Filed: 12/27/2022 Entry ID: 5230640

*United States v. Crosby*, 75 F.3d 1343 (9th Cir. 1996) ..............................................8

*United States v. Doe*, 170 F.3d 1162 (9th Cir. 1999) ...............................................19

*United States v. Dozier*, 31 F.4th 624 (8th Cir. 2022) ...........................................2, 4

*United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990) ..........................................15

*United States v. Horton*, 611 F.3d 936 (8th Cir. 2010) ............................................20

*United States v. Jones*, 918 F. Supp. 2d 1 (D.D.C. 2013) ........................................23

*United States v. Meisel*, 875 F.3d 983 (10th Cir. 2017) ........................................3, 4

*United States v. Midkiff*, 614 F.3d 431 (8th Cir. 2010) ............................................26

*United States v. Moore*, 590 F. Supp. 3d 277 (D.D.C. 2022).............................7, 12

*United States v. Sanchez*, 676 F.3d 627 (8th Cir. 2012)..........................................15

*United States v. Spotted Horse*, 914 F.3d 596 (8th Cir. 2019) ......................... 21, 22

*United States v. West*, 829 F.3d 1013 (8th Cir. 2016) ...........................................2, 4

*United States v. White*, 557 F.3d 855 (8th Cir. 2009)................................................2

*Washington v. Texas*, 388 U.S. 14 (1967) ...............................................................1

*Winfield v. United States*, 676 A.2d 1 (D.C. 1996) ...............................................7, 8

*Yarborough v. Alvarado*, 541 U.S. 652 (2004)........................................................15

*Anderson v. Groose*, 106 F.3d 242 (8th Cir. 1997) .................................................11

**Rules**

Federal Rule of Criminal Procedure 16 ....................................................................21

Federal Rule of Evidence 609..................................................................................10

iv

Federal Rule of Evidence 702.................................................................23

Federal Rule of Evidence 703.................................................................26

Federal Rule of Evidence 901.................................................................24

Federal Rule of Evidence 902.................................................................24

Appellate Case: 22-2178    Page: 6    Date Filed: 12/27/2022 Entry ID: 5230640

## ARGUMENT

When reading the Government's brief, it is easy to lose sight of the core issues on appeal. Duggar was precluded from presenting compelling alternative perpetrator evidence because the district court applied a test the Supreme Court found unconstitutional. Furthermore, the Government's case was built on a house of cards related to time-and-place metadata—but the district court improperly permitted the Government's expert to offer opinions concerning the metadata and prevented Duggar's expert from accurately testifying about the unreliable methodology used by the Government's expert. Finally, law enforcement physically stopped Duggar from contacting his attorney and then interrogated him—requiring suppression. These issues, individually and collectively, require reversal and a new trial.

## I. THE DISTRICT COURT VIOLATED DUGGAR'S RIGHT TO PRESENT A COMPLETE DEFENSE

This is the rare case where a criminal defendant was deprived of "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986). However, instead of engaging with Duggar's argument, the Government attempts to change the rules and rewrite history. But the record below and an accused's "right to present his own witnesses to establish a defense" stand strong. *Washington v. Texas*, 388 U.S. 14, 19 (1967).

The Government asks this Court to adopt a deferential standard of review, although the standard is *de novo* where, as here, an evidentiary ruling implicates a

1

constitutional right. *See United States v. West*, 829 F.3d 1013, 1017 (8th Cir. 2016). And the Government curiously asks this Court to conclude the district court imposed "*no* limitation on Duggar's questioning of [Caleb Williams] with respect to any of the events of circumstances to which he was a percipient witness." Appellee Br. at 13 (emphasis in original). But the limitation was prohibitive: "if he says he wasn't there, you can't talk about what happened" (TR., Vol. 5, p. 911) and if "he wasn't present on the lot" and "assuming he testifies that he's never remoted in, that's as far as you are going to get" (TR., Vol. 6, p. 1364).

Furthermore, in its response, the Government refuses to acknowledge the district court's misunderstanding of *Holmes v. South Carolina*, 547 U.S. 319 (2006), was not an isolated occurrence even though the court repeatedly applied an unconstitutional standard. Appellee Br. at 16.

A. <u>The Standard of Review is *De Novo*</u>

This Court reviews evidentiary rulings *de novo* when they implicate a constitutional right including the right to present a complete defense. *West*, 829 F.3d at 1017 ("We review evidentiary rulings for an abuse of discretion, but our review is *de novo* when the challenge implicates a constitutional right"). *See also United States v. Dozier*, 31 F.4th 624, 627 (8th Cir. 2022); *United States v. White*, 557 F.3d 855, 857 (8th Cir. 2009).

2

Seeking deferential review, the Government mischaracterizes Duggar's argument as "a garden-variety abuse-of-discretion claim" and a "garden-variety prejudice claim." Appellee Br. at n. 4. The Government suggests the district court's evidentiary rulings—even those implicating constitutional rights—are afforded "wide latitude." Appellee Br. at n. 4. The Government is wrong.

The Government's reliance on *United States v. Aungie*, 4 F.4th 638, 644 (8th Cir. 2021) is misplaced as there was no argument in that case the court's ruling implicated a constitutional right. Appellee Br. at 12. The Government also cites *United States v. Meisel*, 875 F.3d 983 (10th Cir. 2017), which reviewed the admissibility of alternative perpetrator evidence for abuse of discretion. Appellee Br. at 12. But this out-of-circuit precedent does not help the Government.

There, the district court *allowed* Meisel to introduce alternative perpetrator evidence. *See Meisel*, 875 F.3d at 998. Meisel argued the court erred in refusing to permit him to *argue*—after admitting the evidence—someone else committed the crime. *See id.* ("Meisel concedes the district court allowed him to present to the jury any evidence he had regarding other individuals' access, potential or actual, to his computer and external hard drive. He, nevertheless, argues that having allowed him to introduce such evidence, the district court's real error was in not allowing him to utilize the term 'alternative perpetrator' in presenting his case to the jury"). The Tenth Circuit concluded that because the court admitted alternative perpetrator

3

evidence, the decision to preclude argument would be reviewed for abuse of discretion. *Id.* at 998-99. The Tenth Circuit noted, "…as demonstrated by the parties' closing arguments, and borne out by the entirety of the trial transcript, it is abundantly clear the district court, the parties, and the jury fully understood Meisel was asserting J.H. and/or W.R. was responsible for the child pornography found on Meisel's external hard drive." *Id.* at 999 n. 20.

But here the jury here did not hear alternative perpetrator evidence—because while Duggar could call Williams, the court expressly ruled that if Williams denied being at the business on specific dates and denied remotely accessing the computer, Duggar could not further inquire and could not impeach Williams with his conviction. (*See* TR., Vol. 5, p. 911; TR., Vol. 6, p. 1364).

Because the evidentiary rulings implicated Duggar's ability to present a complete defense, *de novo* review applies. *See, e.g.*, *Dozier*, 31 F.4th at 628–29; *West*, 829 F.3d at 1017–19.

B.    The Government Attempts to Rewrite History

The Government portrays Duggar's defense vis-à-vis Williams as fanciful and far-fetched—however, it was anything but. And the Government's claim that the district court premised its ruling on Duggar's ability to call and impeach Williams on Duggar's failure to establish "some minimal connection between Williams and

4

any of the events relevant to the charged offenses" is belied by the record. Appellee Br. at 14.

Through evidence and proffer, Duggar established more than a "minimal connection" between Williams and the offenses; the district court simply concluded the Government's evidence was more convincing. But this was a question for the jury. Facing this insurmountable hurdle, the Government argues the district court's analysis was not premised on its perception of the strength of the Government's case because that would be patently unconstitutional.

1. *Duggar Established a Nexus Between Williams and the Charges*

Duggar adduced evidence that: law enforcement failed to investigate Williams (TR., Vol. 3, pp. 302-06) and never analyzed Williams' devices (TR., Vol. 4, p. 817); the computer could have been accessed remotely (TR., Vol. 5, pp. 1092-93; 1101; 1108-11; TR., Vol. 4, pp. 790-98); the images and videos were "streamed," suggesting remote access was possible (TR., Vol. 5, pp. 1080-90; TR., Vol. 4, p. 879); Williams regularly used the computer (TR., Vol. 4, pp. 727-31; Def. Ex. 48); and the Government withheld evidence concerning Williams (TR., Vol. 5, pp. 898-915). Duggar was prepared to introduce text messages between Williams and Duggar suggesting Williams' presence during the relevant time period (TR., Vol. 6, p. 1356).

Appellate Case: 22-2178    Page: 11    Date Filed: 12/27/2022 Entry ID: 5230640

If permitted to inquire, Duggar would have established Williams: worked at the business; had familiarity with the computer and its software; engaged in eBay sales and utilized the computer to print labels; sent a text message on May 7, 2019 offering to watch the business that week; spent the night one mile from the business on May 9, 2019; and concealed all metadata on documents provided to the Government in an attempt to establish he was not present. (TR., Vol. 6, pp. 1355-58).

Further demonstrating a nexus, the Government concedes the Linux installation program was downloaded on May 11, 2019. Appellee Br. at 4 (citing Gov't Ex. 28 at 12). And Government counsel proffered Williams did not leave Arkansas until May 11, 2019 which, in the Government's view, ruled him out as a suspect. Appellee Br. at 10 (quoting TR., Vol. 6, p. 1359).

This evidence demonstrates a nexus between Williams and the charges. Even accepting the Government's proffer, Williams was in Arkansas, Missouri, or Illinois on each relevant date. Indeed, according to the Government, Williams was in Arkansas, Missouri, *and* Illinois on May 11, 2019. Appellee Br. at 10 (quoting TR., Vol. 6, p. 1359). Thus, to the extent Williams' location on any day matters, the Government's proffer reveals the possibility he could have been in more than one place on any given day.

6

The district court's conclusion that Duggar failed to establish a "minimal connection" between Williams and the offenses is refuted by the record. Duggar adduced and proffered evidence that permitted him to question and impeach Williams concerning his actions—but the district court believed the Government's proffered counterevidence. This was a decision for the jury, not the court.

The Constitution guarantees the right to a "meaningful opportunity to present a complete defense." *Holmes*, 547 U.S. at 324 (quotations omitted). This limits a district court's ability to impose "arbitrary" rules, including those that exclude "important defense evidence" without serving "any legitimate interests," or are otherwise "disproportionate to the purposes they are designed to serve." *Id.* at 324–25 (quotation marks and citation omitted). "The constitutional right to present a complete defense undergirds a defendant's right to present evidence that a third party committed the crime of which he is accused." *United States v. Moore*, 590 F. Supp. 3d 277, 281 (D.D.C. 2022) (citation omitted). *See also Boykin v. United States*, 738 A.2d 768, 773 (D.C. 1999) ("The Sixth Amendment guarantees to criminal defendants not only the right to confront and cross-examine witnesses against them, but also the right to present evidence that someone else committed the offense for which [they are] on trial") (quotation marks omitted).

The district court's ruling that Duggar would not be permitted to inquire further or impeach Williams' credibility if Williams denied being on the lot or

7

remotely accessing the computer constituted an arbitrary ruling in violation of Duggar's rights as the evidence established a sufficient nexus between Williams and the offenses.

A trial court should "resolve close questions of admissibility in this setting in favor of inclusion, not exclusion." *Winfield v. United States*, 676 A.2d 1, 6 (D.C. 1996). "[I]f the evidence [that someone else committed the crime] is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt." *United States v. Crosby*, 75 F.3d 1343, 1349 (9th Cir. 1996) (quotations omitted). The district court deprived Duggar of the right to present a complete defense so the jury could make a reasoned determination about the strength of the Government's case. *See, e.g., Winfield*, 676 A.2d at 7 (cautioning against "excessive mistrust of juries" and noting that while "the trial court retains broad discretion to prevent the *cumulation* of third-party perpetrator evidence, sifting the relevance of that evidence is largely about drawing commonsense inferences from uncomplicated facts, something we regularly entrust to juries") (emphasis in original; citation omitted).

The Government cites *Armstrong v. Hobbs*, 698 F.3d 1063 (8th Cir. 2012), arguing this Court upheld a rule excluding evidence tending to show another person committed the crime charged "unless that evidence points directly to the guilt of the

Appellate Case: 22-2178    Page: 14    Date Filed: 12/27/2022 Entry ID: 5230640

third party." Appellee Br. at 17. But *Armstrong* was a habeas corpus case in which the question before this Court was simply whether the state court's decision was "contrary to, or an unreasonable application of, clearly established federal law." *Armstrong*, 698 F.3d at 1067. This extremely deferential review mandated affirmance if "no 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 1066 (quotations omitted). *Armstrong*'s unremarkable holding that a ruling was not contrary to "clearly established federal law" is not relevant.

Duggar's evidence that Williams had the access, opportunity, knowledge, and motive to commit the crimes charged was more than sufficient.

2. *The District Court Prohibited Meaningful Questioning of Williams*

The Government's suggestion that the district court's limitation of Duggar's ability to inquire was merely "hypothetical" and that Duggar was given "leeway to call Williams and establish through his testimony his capacity to have committed these offenses" finds no support in the record and is based on a false premise. Appellee Br. at 14.

First, Duggar had already established Williams' capacity to commit these crimes. Second, the limitation imposed was concrete, making it impossible for Duggar to call Williams to testify.

9

The district court expressly ruled Duggar would only be permitted to ask Williams "whether or not he has knowledge or recollection of being present on the car lot on or about May 13 through May 16" and "if he ever remoted in to the office machine, and if so, the time periods in which he would have remoted in." (TR., Vol. 6, p. 1363). The court ruled if "he wasn't present on the lot" and "assuming he testifies that he's never remoted in, that's as far as you are going to get and the Court would find in that instance under 403 that the 609 conviction that you have discussed should not be allowed[.]" (*Id.* at 1364). The ruling was clear: if Williams denied being present and remotely accessing the computer, Duggar could not impeach his credibility. This was not a "singular, narrow, and contingent restriction"—it was an exclusion of testimony from a critical witness the district court apparently ruled out as a viable perpetrator. Appellee Br. at 14.

"Any party, including the party that called the witness, may attack the witness's credibility." Fed. R. Evid. 607. Williams' statements to Government investigators made clear he would deny being present and remotely accessing the computer. As such, Duggar was prepared to impeach Williams' credibility by introducing evidence Williams had a felony conviction for a sex offense involving a minor.

The ability to impeach a witness' character for truthfulness with a criminal conviction is mandated where the probative value of the evidence is not substantially

Appellate Case: 22-2178    Page: 16    Date Filed: 12/27/2022 Entry ID: 5230640

outweighed by any of the dangers in Rule 403. *See* Fed. R. Evid. 609 (a)(1)(A). Even in civil cases, this Court has concluded a district court erred in precluding impeachment with prior felony sex convictions where a witness' credibility is paramount. *See Am. Mod. Home Ins. Co. v. Thomas*, 993 F.3d 1068, 1071 (8th Cir. 2021) ("Rule 609 'is based on the common sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath'") (quoting *Cummings v. Malone*, 995 F.2d 817, 826 (8th Cir. 1993)). In a criminal case, this is even more important.

The Government's suggestion that the district court did not violate Duggar's right to compel a witness because Williams was present lacks merit. Appellee Br. at 13. Unless a defendant is permitted to meaningfully question a witness whose presence he has compelled, this right rings hollow. *See Anderson v. Groose*, 106 F.3d 242, 246 (8th Cir. 1997) ("although by its terms the Compulsory Process Clause confers only the right to compel witnesses to appear through use of subpoena power, the Clause has consistently been given a broader interpretation. This broader interpretation necessarily encompasses the right to present witness testimony, for the right to compel a witness's presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness's testimony heard by the trier of fact") (citation omitted). The Government's silence on this authority speaks volumes.

3. *The District Court Consistently and Repeatedly Misconstrued Holmes*

The district court applied a test the Supreme Court held unconstitutional—but the Government attempts to sidestep this issue by arguing the court made an isolated mistake when quoting a section of *Holmes*. Appellee Br. at 16. What the record actually reveals is that the court read approvingly from this section of *Holmes* during trial *and* during an on-the-record conference the previous day. Contrary to the Government's argument that the district court "did not misunderstand or misapply governing principles" (Appellee Br. at 16), the court expressly stated during that conference, "this concept that the greater the strength of the evidence of the government pointing to the defendant relative to the strength of this nexus, that *that weighs into part of the Court's analysis as to whether it will include or permit or exclude that*." (TR., Vol. 5, pp. 910-11) (emphasis added). To this, the Government has no response.

The record reveals the district court retained its misapprehension of *Holmes* when effectively preventing Duggar from calling Williams by unconstitutionally considering the strength of the Government's case.

C. This Error Was Not Harmless

The Government's assertion the district court's error was harmless is based on a false premise: that Williams must have been the individual who committed the offenses. *See, e.g., Moore*, 590 F. Supp. 3d at 283 ("Since the third party is not on

12

trial, the evidence proffered need not 'prove or even raise a strong probability that a person other than the defendant committed the offense' so long as it 'tend[s] to create a reasonable doubt" as to the defendant's guilt'") (citations omitted).

Here, Duggar was entitled to present evidence that someone else had the motive, opportunity, and knowledge to commit the offenses and the Government's assertion that no evidence inculpates Williams is inaccurate and misses the mark.

Furthermore, the district court's speculation that Duggar made a strategic decision not to call Williams as it would "invite the Government's proffered rebuttal testimony" is inaccurate. Appellee Br. at 21 (quoting R. Doc. 156, at 20). The defense wanted the jury to consider the totality of evidence related to Williams—but the district court made that impossible. Had Duggar called Williams and Williams denied being on the lot and remotely accessing the computer, Duggar was not permitted to further inquire or impeach Williams. At that point, the Government would have had no reason to introduce rebuttal evidence. However, had the district court permitted both sides to introduce evidence regarding Williams, the jury would have been able to evaluate whether the Government proved Duggar guilty beyond a reasonable doubt. That is not only what the law allows, but what the Constitution requires.

The Government also argues, "Duggar has never explained how Williams could have physically installed the partition on the desktop when he was, according

Appellate Case: 22-2178    Page: 19    Date Filed: 12/27/2022 Entry ID: 5230640

to all available evidence, not even in the same state on the date of installation." Appellee Br. at 22. First, as noted *supra*, it was possible for Williams to be in more than one state on any given day. Second, the only "available evidence" concerning Williams' whereabouts—because he chose to speak with the Government but not the defense—was untested by the rules of evidence and cross examination. The Government has *never* introduced any evidence, credible or otherwise, that Williams was *not* in Arkansas on May 13.

Moreover, the crime charged was *not* the insertion of a thumb drive or the installation of an operating system—but the possession of child pornography which the evidence established could have been, and likely was, accessed remotely. Even the Government's expert admitted he could not rule this out.

Whether the Government had effectively eliminated Williams as a suspect was a question Duggar was entitled to have answered by the jury. But the district court deprived Duggar of his right to present a complete defense.

## II.     THE DISTRICT COURT ERRED IN DENYING DUGGAR'S MOTION TO SUPPRESS STATEMENTS

It is undisputed that when Duggar attempted to call his lawyer, a federal agent wearing a ballistic vest physically took his phone from his hand—and then interrogated him in a law enforcement vehicle. This was no oversight; it was a plan executed by law enforcement who conducted surveillance, waiting for Duggar to arrive before executing a search warrant at a business when there was no reason its

14

owner had to be present. And the district court correctly found the business was accessible only by a divided highway with no sidewalk and was "in the middle of nowhere." (TR., Vol. 7, p. 1584).

Faced with binding precedent that "a suspect who has invoked the right to counsel cannot be questioned regarding any offense *unless an attorney is actually present*," *Davis v. United States*, 512 U.S. 452, 458 (1994) (emphasis added), and the fact that this is precisely what happened, the Government argues Duggar was not in custody—a contention this Court should reject.

A.     Duggar Was in Custody

The Government relies exclusively on the factors set out in *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). But this Court noted these factors are "decidedly non-exhaustive." *Id*. As this Court later clarified, the "analysis depends upon a review of the totality of the circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'" *United States v. Sanchez*, 676 F.3d 627, 630–31 (8th Cir. 2012) (quoting *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011)). *See also Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004) (whether an interrogation is custodial "must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances"). Here, the circumstances clearly demonstrate a

15

reasonable person in Duggar's position would have perceived himself to be in custody.

Federal agents surveilled Duggar's business, waiting for him to arrive. (R. Doc. 77 at 156). The business was accessible only by a divided highway with no sidewalk and was "in the middle of nowhere." (*Id*. at 250; TR., Vol. 7, p. 1584). When Duggar arrived, agents—armed and wearing tactical gear—converged in six vehicles. (R. Doc. 77 at 155–57, 159).

Agents Faulkner and Aycock exited their vehicle and went directly to Duggar. (*Id*. at 160). Duggar immediately took out his phone and said he was calling his attorney. (*Id*.). Faulkner took the phone from Duggar's hand, preventing him from calling counsel. (*Id*. at 160–61).

The agents secured the business. (*Id*. at 30). Faulkner testified Duggar would not have been able to enter the buildings on the lot without an escort. (*Id*. at 31). An armed agent remained in Duggar's "vicinity keeping situational awareness" at all times. (*Id*. at 166).

Within minutes of swarming the business and seizing Duggar's phone, Faulkner and Aycock asked Duggar whether he would answer questions. (*Id*. at 32–33). The agents then escorted Duggar to a law enforcement vehicle. (*Id*. at 33).

Duggar was not permitted to contact his lawyer and was told his lawyer would not be permitted to come to the scene while the warrant was being executed. (*Id*. at

161, 177-78). Duggar was not allowed to leave in the vehicle in which he arrived (it was being searched) and the keys to other vehicles on the lot were stored in the office (which was also being searched). (*Id.* at 168).

Duggar—blindsided in a rural area, surrounded by armed agents wearing ballistic vests, and without access to a vehicle—attempted to call his attorney only to have his phone physically taken and was told his attorney would not be allowed on the scene. Yet, against this backdrop, the Government argues Duggar "maintained unencumbered freedom of movement" and that the district court was correct in concluding a reasonable person in Duggar's position would have perceived himself as not having been "deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

The Government clings to the notion that Duggar was allegedly told he was free to leave—even though the Government is silent about the inconvenient fact that he had no means to leave. Appellee Br. at 25. He would have effectively had to walk on the shoulder of a rural highway to leave the police-dominated environment.

The Government also contends Duggar was not restrained. Appellee Br. at 25. But restraint is about more than being handcuffed. Duggar was placed in a police vehicle with two armed agents. (R. Doc. 77 at 170–71). He was told his attorney could not join him after he attempted to call counsel, and he had no access to a vehicle.

17

In suggesting Duggar voluntarily acquiesced in the agents' request he answer questions, the Government claims—though not relevant to custody—Duggar posed the first question himself, implausibly suggesting he mentioned child pornography. Appellee Br. at 26. However, the record reveals that as they approached Duggar, agents stated the investigation involved allegations of "digital contraband." (R. Doc. 77 at 165). And nothing on the recorded interview remotely suggests Duggar asked this question. More importantly, it is absurd to argue Duggar—who tried to call his lawyer and was told his lawyer could not come to the scene—was in a position to "voluntarily acquiesce" to the agents' "invitation" to speak with them. Appellee Br. at 26. What actually transpired is inconsistent with the Government's claim the agents did not employ coercive tactics. Appellee Br. at 27.

Remarkably, the Government takes issue with the district court's conclusion that the scene was "police-dominated." Appellee Br. at 28. A business in a rural area inundated with armed agents, who established total control over the area and Duggar, epitomizes police domination.

The Government also attempts to draw significance to the fact that Duggar was not arrested. Appellee Br. at 29. However, what transpired *after* Duggar tried to call his attorney and after he was interrogated does not reflect how a reasonable person in Duggar's position would have perceived his situation when agents seized

18

his phone from his hand, deprived him of access to counsel, and seated him in a police vehicle for questioning.

The Government's refusal to acknowledge a person is in custody for purposes of this analysis when he is "otherwise deprived of his freedom of action *in any significant way*" exposes the precariousness of its position. *See Miranda*, 384 U.S. at 444 (emphasis added). Indeed, while the focus remains on Duggar's perception of the circumstances, the agents interrogating Duggar read him his *Miranda* rights which attach "only when a suspect interrogated by the police is 'in custody.'" Appellee Br. at 23 (quoting *Thompson v. Keohane*, 516 U.S. 99, 102 (1995)). That agents believed Duggar was entitled to a *Miranda* warning is significant.

This Court should conclude a reasonable person in Duggar's position would have felt "deprived of his freedom of action in any significant way." *See Miranda*, 384 U.S. at 444.

B.    The Seizure of Duggar's Phone Violated His Rights

In the alternative, the Government argues law enforcement's physical interference with Duggar's attempt to call counsel was not problematic because it was an ineffective "pre-interview invocation" of his right to counsel. Appellee Br. at 32. The Government acknowledges Duggar's invocation is valid if it was "for the purpose of having counsel at the interrogation." *Id.* (citing *United States v. Doe*, 170

F.3d 1162, 1166 (9th Cir. 1999)). And Duggar clearly attempted to contact counsel to have counsel present at the scene where the interrogation occurred.

Duggar invoked his right to counsel by attempting to call counsel as armed agents in tactical gear rapidly descended upon him in six vehicles. This was not *pre*-custodial. He was surrounded by agents, two of whom were making a beeline toward him. At that moment, Duggar had already been "deprived of his freedom of action in any significant way," *Miranda*, 384 U.S. at 444, and no reasonable person in his position would have felt free to leave. Indeed, fleeing at the sight of police creates a reasonable suspicion an individual is engaged in unlawful activity. *See, e.g., United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010) (reasonable suspicion exists when officers witness flight upon seeing police).

In a last-ditch effort to avoid suppression, the Government argues, "even if (1) Duggar effectively invoked his right to counsel, and (2) the interview qualified as custodial, such that (3) his *Miranda* rights were implicated, Duggar knowingly and voluntarily waived them." Appellee Br. at 32. This argument fails.

Where a person "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease" and where he "states that he wants an attorney, the interrogation must cease *until an attorney is present.*" *Miranda*, 384 U.S. at 473–74 (emphasis added). The Supreme Court has repeatedly "held that a suspect who has invoked the right to counsel cannot be

20

questioned regarding any offense *unless an attorney is actually present*." *Davis*, 512 U.S. at 458 (emphasis added). Law enforcement made a choice here: instead of safeguarding Duggar's rights, they physically stopped him from speaking with counsel and told him his lawyer could not come to the scene. (R. Doc. 77 at 177-78).

As the Supreme Court cautioned nearly 60 years ago, "[n]o system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights. If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with that system." *Escobedo v. State of Ill.*, 378 U.S. 478, 490 (1964) (footnotes omitted). "[T]he accused must be permitted to consult with his lawyer." *Id.* at 492.

## III. THE DISTRICT COURT ERRED IN PERMITTING THE GOVERNMENT'S EXPERT TO TESTIFY CONCERNING EXIF METADATA AND IN PRECLUDING DUGGAR'S EXPERT FROM OPINING ON THE UNRELIABILITY OF THE DATA AND THE METHODOLOGY

### A. The District Court Abused Its Discretion by Allowing Fottrell to Testify About EXIF Metadata

The Government argues Fottrell was qualified to offer expert opinions about the *extraction* of metadata from devices. Appellee Br. at 39. But that is not the issue before this Court. The district court abused its discretion by permitting Fottrell to draw inferences from the metadata without providing necessary testimony about the creation of that metadata and without pretrial notice. Given that the Government's

21

entire case was predicated on attempts to place Duggar at the business at certain times, the error was far from harmless.

Under Federal Rule of Criminal Procedure 16(a)(1)(G)(iii), the Government must disclose "the expert's opinions, bases for the opinions, and reasons for the opinions." *United States v. Spotted Horse*, 914 F.3d 596, 601 (8th Cir. 2019). But the Government only disclosed Fottrell would testify "that digital photos taken by [Duggar] that contain metadata, including geolocation information, as outlined in Special Agent Faulkner's reports provided in the discovery were recovered from the MacBook." (R. Doc. 134-1 at 2-3).

Because the disclosure was inconsistent with Fottrell's testimony, the Government attempts to reframe the reference to digital photos and metadata as describing a general topic about which Fottrell would testify. Appellee Br. at 40 ("Fottrell was expected to offer expert testimony on 'digital photos taken by [Duggar] that contain metadata, including geolocation information, . . . recovered from the MacBook'") (alterations in original). While the Government may disclose expert opinions "in summary fashion," *Spotted Horse*, 914 F.3d at 601, the Government disclosed a specific opinion Fottrell would offer: "that digital photos taken by [Duggar] that contain metadata . . . were recovered from the MacBook." (R. Doc. 134-1 at 2-3).

22

The issue before this Court is not that Fottrell testified photos were recovered or contained metadata, but that he testified: (1) he uses metadata to establish identity and location; (2) the metadata contained coordinates; (3) he plugged those coordinates into Google Maps; and (4) Duggar's iPhone was located at the business at certain times. (TR., Vol. 4, pp. 621–25).

This is not only a failure to disclose. Fottrell was never qualified to offer this critical testimony in the first place. He lacks any expertise concerning the technology used to create the coordinates—a necessary basis for conclusions regarding the location of a phone. As explained in *United States v. Crawford*, 1:19-CR-170, 2021 WL 2367592, at *3 (W.D.N.Y. 2021), opinions about data extracted from cell phones require expert testimony explaining the process by which geolocation data is produced. Though he referred to geolocation data as "GPS coordinates," Fottrell lacked the expertise to explain how those coordinates were produced—and never attempted to offer an explanation.

The Government relies exclusively on inapposite authority. Citing *United States v. Jones*, 918 F. Supp. 2d 1, 5 (D.D.C. 2013), the Government argues an explanation of the technology used to produce the coordinates is unnecessary because courts recognize the reliability of cell-phone metadata. Appellee Br. at 41. But *Jones* found only that the use of cell phone location records based on cell-site analysis is recognized as a reliable methodology for determining the location of a

23

phone. *Jones*, 918 F. Supp. 2d at 5. The ultimate reliability of cell-site analysis, GPS technology, Wi-Fi, or any other technology used to track the location of phones is not the issue, because Fottrell never explained what technology produced the coordinates. In other words, the issue is not whether Rule 702(c) or (d) is satisfied (whether the "principles and methods" are reliable). Fottrell never offered the expert testimony necessary to support his conclusions because he lacked the requisite "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a).

The Government attempts to shift the focus to authentication under Rules 901 and 902—but, again, that is not the issue. Indeed, *Crawford* makes clear a witness authenticating geolocation data does not eliminate the need for expert testimony explaining how the data was produced. *Crawford*, 1:19-CR-170, 2021 WL 2367592, at *3. The Government's reliance on *United States v. Banks*, 43 F.4th 912 (8th Cir. 2022) is similarly misplaced. *Banks* addressed the issue of authenticating photos extracted from phones, *not* whether the photos were appropriately the subject of expert testimony regarding their metadata. *See id.* at 918.

The Government asserts *Crawford*—the most recent and relevant case—does not apply. But as the Government concedes, *Crawford* required "an expert witness to explain and support the methods used by Google to obtain the geolocation data" and the expert in *Crawford* had "no expertise in how the underlying records were produced." Appellee Br. at 42 (quoting *Crawford*, 1:19-CR-170, 2021 WL 2367592,

Appellate Case: 22-2178     Page: 30     Date Filed: 12/27/2022 Entry ID: 5230640

at *3). Identically, Fottrell has no expertise in geolocation technology. Knowing an iPhone automatically attaches geolocation and date-and-time location to a photo and how to extract data does not equate to knowledge of how the phone produced the data or how Google Maps generates location information.

Finally, the Government's reliance on Fottrell's efforts to "verify" the accuracy of metadata misses the point. Fottrell testified he input the coordinates into Google Maps to confirm they corresponded to the business. (TR., Vol. 4, p. 623). But this is a red herring. The issue is not whether the coordinates correspond to the business, but that the Government never offered qualified expert testimony the coordinates reliably indicate the location of the phone when the photos were taken and the way in which Google Maps generates location information. Whether two photos depict an unplated car and a computer is irrelevant to the fundamental problem that Fottrell has no idea how an iPhone produces geolocation coordinates and how Google Maps operates.

Fottrell offered opinions he was not qualified to offer, that were not supported by an explanation of the underlying technology, and about which Duggar was never notified. The district court erred in permitting Fottrell to offer this testimony.

B.     The District Court Erred by Excluding Duggar's Expert's Testimony About EXIF Metadata

The Government argues Duggar should have "exposed any unreliability in the metadata" through cross-examination, not exclusion. Appellee Br. at 42. But the

25

Government objected when Duggar attempted to challenge the reliability of Fottrell's opinions with testimony from Bush. The district court erred by preventing Bush from offering rebuttal testimony that the Government invited and which she was qualified to provide.

Duggar's evidentiary proffer established Bush would testify the methods Fottrell used to interpret metadata were unreliable. The Government argues Bush's proffered testimony is contrary to Rule 703 because she had not personally analyzed the photos' metadata. Appellee Br. at 44–45.

But the Government's position misses the point. Bush would not have testified about the specific metadata at issue. (TR., Vol. 6 at 1319). Rather, she would have critiqued the methods Fottrell used to analyze the metadata—namely, his reliance on Windows Photos. (*Id.* at 1312–18). Bush's proffered testimony satisfied Rule 703 because it was based on information about which she was made aware during trial and personally observed.

Further, by asking Bush to testify about the photos' metadata, the Government opened the door to this proffered rebuttal testimony. The Government made "unfair prejudicial use," *United States v. Midkiff*, 614 F.3d 431, 442 (8th Cir. 2010), of the photos by asking Bush to confirm the time displayed on the Government's exhibit in a clear attempt to bolster its argument the photos place Duggar at the business at certain times. (*See* TR., Vol. 6, pp. 1235–38, 1261, 1263; Gov't. Exs. 74, 80). The

26

Government argues this was not unfair because Bush was allowed to clarify she had not independently confirmed the accuracy of the timestamps displayed in the exhibits. Appellee Br. at 45. However, the fact remains that the Government elicited testimony from Bush regarding the time displayed in the photos' metadata, but the district court prevented Bush from challenging the Government's assumption that those timestamps actually indicate when the photo was taken—an assumption she would have challenged by testifying about the unreliability of Fottrell's methodology.

Furthermore, the Government insists Fottrell never asserted Windows Photos is a forensic tool. Appellee Br. at 46. But that is irrelevant. Fottrell used forensic tools to *extract* the metadata and not to *display* it—but Bush would have opined he did not use a forensic tool to *analyze* it. Windows Photos, which is not a forensic tool, was what Fottrell exclusively used to determine when photos were taken. (TR., Vol. 6, at 1317–18). As Bush proffered and courts recognize, metadata is unreliable because it is complex and dependent on settings including time zones of every device that creates, receives, or otherwise manipulates a photo to which metadata is attached.[1] (*See id.* at 1314–18). *See, e.g., Pearson v. U.S. Bank Nat'l Ass'n*, No. 13-

---

[1] The Government concedes that in *United States v. Boyajian*, No. 09-cr-933, 2012 WL 4094977 (C.D. Cal. 2012), it argued metadata produced by standalone cameras is unreliable. Appellee Br. at 43. Bush was prepared to testify metadata produced by phones relies on the time zone set on the phone, which can be misleading, especially when a photo is sent from one phone to another. (TR., Vol. 6, pp. 1315–16).

Appellate Case: 22-2178     Page: 33     Date Filed: 12/27/2022 Entry ID: 5230640

889, 2014 WL 4163020, at *17 (D. Minn. Aug. 21, 2014) (document creation date testimony based on metadata is speculative "especially in light of the common understanding that 'creation dates' in metadata may be altered by copying a document or moving it to a new location"); *Florida Bar v. MacNamara*, 132 So. 3d 165, 170 (Fla. 2013).

The district court erred by allowing Fottrell to offer opinions about metadata and by prohibiting Bush from challenging his methodology. As specific dates and times were the house of cards on which the Government's case was built, this was not harmless and requires reversal.

## <u>CONCLUSION</u>

Duggar respectfully requests that this Court vacate his conviction, suppress his statement, and remand for a new trial.

Respectfully submitted,

*/s/ Justin K. Gelfand*
JUSTIN K. GELFAND
IAN T. MURPHY
**Margulis Gelfand, LLC**
ATTORNEYS FOR APPELLANT
7700 Bonhomme Avenue, Suite 750
St. Louis, MO 63105
Telephone: (314) 390-0234
Facsimile: (314) 485-2264
justin@margulisgelfand.com
ian@margulisgelfand.com

Appellate Case: 22-2178    Page: 34    Date Filed: 12/27/2022 Entry ID: 5230640

*---and---*

TRAVIS W. STORY
**Story Law Firm, PLLC**
ATTORNEY FOR APPELLANT
2603 E. Main Drive, Suite 6
Fayetteville, AR 72704
Telephone: (479) 443-3700
travis@storylawfirm.com

# CERTIFICATES OF SERVICE AND COMPLIANCE

## Certificate of Service

I hereby certify that I filed the foregoing through the Court's CM/ECF system which will provide notice of filing to all counsel of record.

## Certificate of Compliance

I hereby certify that I prepared this brief, filed on December 27, 2022, using Microsoft Word version 16.55 (2021). I further represent that this brief complies with the type-volume limitations in Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains 6,478 words. In making this certification, I relied upon the word count feature of Microsoft Word version 16.55 (2021). This brief was prepared using size 14 Times New Roman font. Furthermore, the computer file supplied has been scanned and is virus-free.

*/s/ Justin K. Gelfand*
JUSTIN K. GELFAND
IAN T. MURPHY
**Margulis Gelfand, LLC**
ATTORNEYS FOR APPELLANT
7700 Bonhomme Avenue, Suite 750
St. Louis, MO 63105
Telephone: (314) 390-0234
Facsimile: (314) 485-2264
justin@margulisgelfand.com
ian@margulisgelfand.com